906 So.2d 782 (2004)
Debbie WHEAT, Appellant,
v.
Pamela LINDSLEY, Appellee.
No. 2002-CA-02134-COA.
Court of Appeals of Mississippi.
December 14, 2004.
Rehearing Denied March 15, 2005.
Certiorari Denied June 23, 2005.
*784 Kim T. Chaze, attorney for appellant.
Jack W. Land, Joe D. Stevens, Hattiesburg, attorneys for appellee.
Before KING, C.J., IRVING and MYERS, JJ.
IRVING, J., for the Court.
¶ 1. Debbie Wheat, a real estate agent, appeals from an adverse judgment rendered by the Chancery Court of Lamar County which found that the relationship between her and Pamela Lindsley, a land purchaser, was that of principal and agent; that Wheat owed a fiduciary duty to Lindsley; and that Wheat owed Lindsley $91,266.02 resulting from the conversion by Wheat of $81,000 in loan proceeds intended for Lindsley's benefit and the failure by Wheat to repay $10,266.02 of a $15,000 loan from Lindsley to her. Feeling aggrieved by this decision, Wheat appeals and asserts the following issue: (1) whether or not the chancellor ruled against the overwhelming weight of the evidence in finding that there was not a joint venture between Wheat and Lindsley and that Lindsley was entitled to recover from Wheat.
¶ 2. Ascertaining no error, we affirm.

FACTS
¶ 3. The underlying dispute giving rise to this appeal involves transactions between Debbie Wheat and Pamela Lindsley regarding a $15,000 loan from Lindsley to Wheat and a business arrangement between Lindsley and Wheat involving the purchase of two lots by Lindsley and the supervision by Wheat of the construction of residential houses on the lots. These lots are referred to in this opinion as Lots 39 and 40.
¶ 4. Lindsley, a nurse, received a substantial sum of money as a result of an accidental injury around 1985. After her injury, she left the nursing profession and concentrated on investment opportunities. Wheat is a licensed and experienced real estate sales person. Lindsley and Wheat became acquainted several years prior to their entering into several real estate transactions and the loan which are the genesis of this litigation.
¶ 5. On March 18, 1998, Lindsley issued to Wheat a check for $15,000 which Wheat cashed. The check was drawn on a joint account which they maintained at First National Bank. Lindsley initially wrote the word, "loan," on the memo portion of the check but later added the notation, "advance to be repaid 1 month." Wheat did not deny receiving and retaining the money and that it was an amount to be repaid. However, the women disagreed as to whether this amount was repaid. Wheat pointed to deposits of $6,000 and $9,000 to the joint account as being repayment of the loan, while Lindsley's interpretation of those deposits was totally contrary. Lindsley did confess, however, that Wheat was entitled to a credit on this debt in the sum of $4,766.02 resulting from a payment made by Wheat in settling the account between them on Lot 40.
¶ 6. The two specific deals which have produced the conflict between the parties center around the purchase by Lindsley, at the suggestion of Wheat, of two lots in a development area called Fieldstone, Lots 39 and 40. It was the parties' intention that these two lots be purchased by Lindsley *785 and a "spec" house constructed on each lot. The houses would then be sold for a profit. As between the two women, there was not, and never was, any written definitive agreement between them as to the relationship, rights, obligations, and ultimate expectations of receipts by either of them as a result of the projects undertaken.
¶ 7. In early February 1992, Lindsley purchased and took title to lots 39 and 40. At Wheat's suggestion, Lindsley transferred title in Lot 40 to Wheat. Wheat served as primary supervisor for the construction of the house and operated through a bank account established for her use in completion of the house.
¶ 8. When the closing of the Lot 40 transaction occurred on June 8, 1998, Lindsley was present and participated in the transaction although the closing papers listed Wheat as the seller and settler of the closing, with all documents being duly signed by Wheat. The sales commission from the sale was paid to Re/Max Real Estate, the agency with which Wheat was an operating salesperson. The net proceeds from the sale were paid to and received by Lindsley as the acknowledged principal in the deal.
¶ 9. Lot 39, owned by Lindsley, was likewise scheduled to have a house constructed on it. As was the case with the construction of the house on Lot 40, the construction on the house on Lot 39 was to be supervised and sold by Wheat. As was done in the Lot 40 transaction, Lindsley, at Wheat's suggestion, transferred title of Lot 39 to Wheat on May 5, 1998. On the same day, Wheat negotiated a loan from Lamar Bank for the principal sum of $100,000, securing the loan by a deed of trust on Lot 39. The loan proceeds were ultimately credited to the Lot 39 checking account. Wheat thereafter reconveyed Lot 39 back to Lindsley on June 3, 1998. Thereafter, Wheat made an $81,000 withdrawal from the Lot 39 account, leaving $19,000 in the account. This withdrawn amount was never replaced into the account. Lamar Bank subsequently foreclosed on the deed of trust with a purported purchase by Wheat, but this transaction was set aside by an agreed judgment. The judgment further deeded Lot 39 to the Bank. The Bank completed the construction of the house and subsequently sold the property with a relatively substantial deficiency.
¶ 10. On September 30, 1998, Lindsley filed a petition for accounting of funds and other relief against Wheat. She subsequently filed an amended petition for damages for breach of contract, cancellation of contract, accounting of funds, permanent injunction and other relief. Wheat filed her answer and counterclaimed for specific performance and injunctive relief, an accounting, actual damages, punitive damages, and attorney's fees.
¶ 11. The Chancery Court of Lamar County bifurcated the causes of action and rendered decisions on two issues: the contractual relationship which existed between Wheat and Lindsley and the amount of money owing between the two parties. In a memorandum opinion dated August 8, 2000, the court found that the relationship between Wheat and Lindsley was that of principal and agent with Lindsley being the principal and Wheat as her real estate agent. The court also found that Wheat was in a fiduciary relationship with Lindsley, subject to the Rules and Regulations of the Mississippi Real Estate Commission. In a subsequent memorandum opinion, the court found that Lindsley was entitled to a monetary judgment against Wheat in the amount of $91,266.02 plus pre-judgment and post-judgment interest.

*786 ANALYSIS AND DISCUSSION OF THE ISSUES
¶ 12. This Court employs a limited standard of review on appeals from the chancery court. "[I]f the substantial credible evidence supports the chancellor's decision, it will be affirmed." Reddell v. Reddell, 696 So.2d 287, 288 (Miss.1997). "[This] Court will not interfere with the findings of the chancellor unless the chancellor was manifestly wrong, clearly erroneous or a wrong legal standard." Id. "A chancellor sits as fact-finder and in resolving factual disputes, is the sole judge of the credibility of witness." Murphy v. Murphy, 631 So.2d 812, 815 (Miss.1994).
¶ 13. Wheat argues that the chancellor abused his discretion when he found that there was no joint venture between her and Lindsley regarding the real estate transactions. She explains that the chancellor's ruling was against the weight of the evidence because (1) Lindsley admitted that a joint venture existed between them, (2) the parties maintained a joint bank account to which each had access, (3) Lindsley voluntarily deeded both Lot 39 and 40 to her in order to obtain loans and benefits from the bank, and (4) they previously shared profits from properties they sold in the past. Lindsley counters that the chancellor correctly found that the parties' relationship was that of agent and principal.
¶ 14. In Pittman v. Weber Energy Corp., 790 So.2d 823, 826(¶ 10) (Miss.2001), our supreme court explained the concept of a joint venture:
[T]his Court first observed no exact definition could be given of a joint venture, the answer in each case depended upon the terms of the agreement, the acts of the parties, the nature of the undertaking and other facts. We broadly defined a joint venture as an association of persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, efforts, skill and knowledge. We said it exists when two or more persons combine in a joint business enterprise for their mutual benefit with an understanding that they are to share in profits or losses and each to have a voice in its management. We noted a condition precedent for its existence was a joint proprietary interest in the enterprise and right of mutual control.
¶ 15. On the other hand, an agency relationship between broker and owner is personal and fiduciary. Smith v. H.C. Bailey Companies, 477 So.2d 224, 235 (Miss.1985). Real estate brokers have a duty to act solely for the benefit of their principals in all matters connected with the agency. Century 21 Deep South Properties, Ltd. v. Corson, 612 So.2d 359, 368 (Miss.1992). Any breach by agent of his duty of good faith to principal, whereby principal suffers any disadvantage and agent reaps any benefit, is fraud, for which agent is accountable, either in damages or by judgment precluding agent from taking or retaining benefits so obtained. Van Zandt v. Van Zandt, 227 Miss. 528, 86 So.2d 466, 470 (1956).
¶ 16. Throughout her testimony, Lindsley asserted that Wheat was functioning as her agent to find various properties that could be acquired by Lindsley and subsequently sold after necessary repair, renovation, and/or new construction. She further explained that Wheat was to assist and participate in the promotion of selling those properties as appropriate to her experience, training, and knowledge as a real estate salesperson, with Wheat obtaining compensation by way of sale commissions or other appropriate compensation. Wheat, on the other hand, asserted that the relationship with Lindsley was a "50/50" joint venture partnership. She explained *787 that they would buy properties, build houses or make other improvements on the property and that she would assist in overseeing the construction and use her expertise to sell the properties.
¶ 17. In its review of the evidence, the chancery court concluded:
[T]he relationship (between Lindsley and Wheat) is not a partnership, nor is it a joint venture endeavor with equal interest and equal sharing aspect, but rather is best characterized as a principal and Wheat in the position of agent.... The relationship was obviously a fiduciary one, but the Court finds no credible basis for concluding that it was a relationship in which Wheat was to share in profits, nor was she to share with Lindsley the "profits", i.e. sales commissions, she realized in the various transactions.
We find that the chancellor's decision that the parties were engaged in a principal and agent relationship is supported by substantial evidence. Here, we first note that there was no express agreement between Lindsley and Wheat, although both acknowledge the existence of an oral agreement to buy and sell properties. Although Wheat testified that she and Lindsley had a "50/50" joint venture partnership, she admitted that she did not recall the terms "50/50" or "half" being used by Lindsley in their agreement. While Lindsley characterized their relationship as a "joint venture," she explained that she understood their agreement to be that Wheat would receive commissions on the sale of Lindsley's properties and that Lindsley would retain any profit from those sales.
¶ 18. The evidence further confirms that Wheat was noted on the listing agreements for the Lot 39 and Lot 40 properties to receive a 6% commission if those properties sold. While Lindsley and Wheat had access to a joint banking account for construction expenditures, all money deposited or withdrawn by either party originated from personal funds of Lindsley or from loans acquired from her properties being used as collateral. Wheat contributed no personal funds to the account. Wheat also testified that she had written very few checks on the account and affirmed that Lindsley was the primary handler of the account.
¶ 19. While Wheat contended that Lindsley deeded her Lot 39 and Lot 40 to help Lindsley secure loans with the Bank, Lindsley testified that her deeding of Lot 39 and Lot 40 to Wheat was not for the purpose of conveying her any interest of a gift to those properties.
¶ 20. It appears that neither party kept the other fully informed as to her individual actions. Moreover, all money obtained by Wheat from the Lot 39 transaction was the result of her actions in withdrawing funds from the joint bank account maintained for the construction of Lot 39. It is clear that in their past transactions that the only money received by Wheat was the standard sales commission and that Lindsley and Wheat never actually engaged in a division of profits realized from any of their past transactions. In fact, in the Lot 40 transaction, a deal in which Wheat had participated and the closing of which was attended by Lindsley, the entire proceeds of the sale were paid to Lindsley with no questions asked or objection made by Wheat.
¶ 21. We therefore find that the chancellor did not err in finding that the parties were engaged in a business relationship whereby Lindsley was the owner/principal and Wheat was her agent. As to the transactions which gave rise to the judgment against Wheat, it is undisputed that Wheat did not have the authority to withdraw for her personal use $81,000 *788 from the Lot 39 construction account. We note that during cross examination, Wheat even admitted that she used the $81,000 for her own personal benefit. Furthermore, Wheat did not provide any explanation of why she was entitled to the $81,000, nor did she present any evidence that the money had been repaid. The remainder of the judgment was for the balance owed on a $15,000 loan from Lindsley to Wheat. As previously observed, Wheat admitted that Lindsley loaned her $15,000. However, Wheat contends that the loan was repaid. The chancellor, as the trier of fact, found against Wheat on this issue. From our review of the record, he was fully justified in doing so.
¶ 22. Therefore, we find that the judgment of the chancery court finding that Lindsley is entitled to recover $ 91,266.02 from Wheat is not against the overwhelming weight of the evidence.
¶ 23. JUDGMENT OF THE LAMAR COUNTY CHANCERY COURT IS AFFIRMED. STATUTORY DAMAGES AND INTEREST ARE AWARDED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., BRIDGES AND LEE, P.JJ., MYERS, CHANDLER, BARNES AND ISHEE, JJ., CONCUR. GRIFFIS, J., CONCUR IN RESULT ONLY.